U.S. BANKRUPTCY COURT
District of South Carolina

Case Number: 05-04184

ADVERSARY PROCEEDING NO: 06-80086

TRIAL ORDER

The relief set forth on the following pages, for a total of 18 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**04/17/2007**



_____
US Bankruptcy Court Judge
District of South Carolina

Entered: 04/17/2007

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>John S. Ducate,<br><br>                                                    Debtor(s).<br><br>Ryan W. Hovis,<br>                                                    Plaintiff(s),<br>v.<br><br>Anne L. Ducate,<br>                                                    Defendant(s). | C/A No. 05-04184-DD<br><br>Adv. Pro. No. 06-80086-DD<br><br>Chapter 7<br><br><br><br>**ORDER** |

THIS MATTER is before the Court on Ryan W. Hovis' ("Trustee" or "Plaintiff") adversary complaint against Anne L. Ducate ("Defendant") filed April 20, 2006 seeking avoidance of allegedly fraudulent transfers pursuant to 11 U.S.C. § 548,[1] and § 544 asserting South Carolina's Statute of Elizabeth, codified as SC Code Ann § 27-23-10.  Trial was held in this adversary March 1, 2007 and March 2, 2007.  Both Plaintiff and Defendant appeared, by and through counsel, to prosecute their case.  Plaintiff's complaint seeks avoidance of the following transfers: (1) Pursuant to § 544 and SC Code Ann. § 27-23-10 the Plaintiff seeks avoidance of the transfer from John S. Ducate ("Debtor") to Defendant of real property, located in the Columbia, South Carolina subdivision known as "The Enclave" ("Enclave Property"), and all personal property including furnishings located therein;  (2) Pursuant to § 548 Plaintiff seeks to avoid monetary transfers made from Debtor to Defendant via deposits into a "household account" held solely in defendant's name within the one year period[2] prior to Debtor's bankruptcy filing, and (3) the transfer to Defendant of a six acre parcel of real property by Jan Investments, Inc., whose sole shareholder is Debtor, located in Columbia, South Carolina on Farrow Road.

---

[1] Unless specified otherwise, further reference to the Bankruptcy Code will be made by Code section only.
[2] Following the 2005 amendments to the Bankruptcy Code, which do not apply to this case, § 548 now provides for a two (2) year look-back period.

### *Findings of Fact*[3]

1. Debtor founded Ducane Company [4] in 1946 and was the controlling shareholder until he sold his interest in late 1999.

2. In 1999, Lennox Inc. ("Lennox") purchased the assets of the furnace division of the Ducane Company Ltd. ("Ducane").

3. At the time of the sale to Lennox Debtor was 80 years old.

4. After taxes, Debtor received between $3.4 million and $3.5 million from the sale of his interest in the Ducane Company assets. Debtor's children, who were minority shareholders in Ducane, received $500,000 each.

5. The Ducane Company's gas grill division, which was not purchased by Lennox, became Ducane Gas Grills Inc. ("DGG").

6. After the sale to Lennox, Debtor retained a 20% interest in DGG, but his son took voting and operational control of that business.

7. Debtor was to be available as a consultant to DGG under a contract and was to be compensated $800,000 in 2000, $700,000 in 2001, $600,000 in 2002, and $500,000 per year thereafter until he could no longer work for DGG. *See Defendant Exhibit #91*.

8. Debtor was president and a co-owner, along with his son, of F&S Realty, LLC ("F&S"). F&S was formed in the year 2000 for the purpose of buying real property and building a manufacturing facility, which was to be leased to DGG.

---

[3] This order contains the findings of fact and conclusions of law made pursuant to Fed. R. Bankr. P. 7052 (adopting Fed. R. Civ. P. 52 in adversary proceedings). To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

[4] Debtor testified that the original name of his company was Ducate Brothers. The name was changed numerous times between its formation and the year Debtor sold his controlling interest. Some of the names used included Ducane Heating Company, Ducane Industries, Ducane Heating Corporation, Ducane Furnace Company, and Ducane Company, Ltd.

2

9. In order to purchase real property F&S borrowed money from Carolina First Bank ("CFB"). Before CFB would loan the money to F&S, CFB required Debtor to sign a personal guaranty in the amount of $500,000.

10. As of June 1, 2000, Debtor had cash and stock accounts totaling between $1.5 and $1.8 million and no or few liabilities. Debtor also anticipated a continuing salary from DGG pursuant to his employment contract.

11. At some point in 2001 DGG began to show signs of financial stress. In an effort to save DGG, Debtor and his son made a capital contribution of $500,000 each and received preferred stock in return for the investment.

12. The Debtor's infusion of capital did not resolve DGG's financial problems and DGG obtained a $1,000,000 loan from Barnwell Economic Development Corporation ("Barnwell").

13. Debtor and Defendant (collectively "Ducates") were married in May 1980 and have resided together since that time.

14. Debtor's estate plan in the early 1990's provided that the Defendant would receive the marital home free and clear, with the liens on the home being paid from Debtor's estate, before any other distributions. From the residuary, $400,000 would be paid to Debtor's grandchildren, with the remainder divided among his children, Debtor's first wife, and Defendant.

15. In 1998, the Ducates purchased a lot at 1104 Enclave Way, Columbia, South Carolina. The couple built a home on the property and occupied it beginning in late 1999.

16. On February 29, 2000, Debtor transferred his one-half interest in the Enclave property to Defendant and received no consideration in return. That same day Jan Investments, Inc. transferred its interests in the Farrow Road property to Defendant.

3

17. On March 20, 2000, the deed transferring Debtor's interest in the Enclave property to Defendant was recorded with the Richland County Register of Deeds Office.

18. Over the course of the marriage it was the common practice for Defendant to attend to the Ducates' household bills and finances, and for Debtor to transfer money into a household account to fund of these expenses.

19. The Defendant and Debtor maintained separate personal bank accounts throughout the marriage and used a household account to pay for their shared day-to-day living expenses.

20. As of the date of his bankruptcy petition, Debtor was liable, pursuant to a personal guaranty, to CFB in the amount of $500,000.00.

21. As of the date of his bankruptcy petition, Debtor was liable, pursuant to a personal guaranty, to Barnwell in the amount of $867,942.62.

22. Debtor was indebted to CFB and Barnwell during the period April 12, 2004 through April 11, 2005.

23. Defendant sold the Enclave home for $945,000 on October 23, 2003. A mortgage totaling approximately $500,000 was paid from the sales proceeds.

24. On December 16, 2005, Defendant sold the Farrow Road property for $165,000.00.

25. In the year prior to Debtor's bankruptcy filing, the household account at Bank of America (Account # XXXX- XXXX- 4757) was not a joint account, but was solely in Defendant's name.

26. The total amount deposited into Defendant's Bank of America Account # 4757 from April 14, 2004 to April 5, 2005 was $334,166.09.

27. Defendant deposited $14,156 from her Social Security benefits from April 20, 2004 through April 20, 2005 into Bank of America account 4757.

28. Debtor filed his chapter 7 bankruptcy petition on April 11, 2005.

### *Procedural History*

The Court by order dated September 13, 2006 dismissed Plaintiff's cause of action involving transfers made by Jan investments, Inc., stating, "The Debtor and Jan Investments Inc. are separate and distinct entities. The Plaintiff has not plead [sic] a transfer of property in which the Debtor had an interest in property for purposes of this cause of action."

Plaintiff and Defendant then filed cross motions for summary judgment. Plaintiff's motion for summary judgment was denied in its entirety based on the Plaintiff conceding at the hearing that there were genuine issues of material fact for trial. Defendant's motion for summary judgment was granted in part and denied in part. Plaintiff's standing to pursue avoidance, under § 544 and SC Code Ann. 27-23-10 ("Statute of Elizabeth"), is derivative of the rights of two creditors in Debtor's bankruptcy case, CFB and Barnwell. By order dated November 6, 2006 this Court ruled that CFB's claim against Debtor was barred by the statute of limitations.[5]

Therefore, the remaining issues for trial include: (1) with the Plaintiff relying on Barnwell for standing, whether the transfer from Debtor to Defendant of the Enclave Property and the personal property is avoidable pursuant to § 544 and SC Code Ann. 27-23-10, and (2) whether any of the transfers by Debtor to the household account are avoidable pursuant to § 548 as fraudulent transfers.

### *§ 544 and SC Code Ann. 27-23-10*

To prove a transfer in violation of the Statute of Elizabeth, the Trustee stands in the stead of a creditor. Section 544 states in relevant part,

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is

---
[5] *See* SC Code Ann. § 15-3-530(7). CFB knew or should have known of the transfer of the Enclave Property on or before December 31, 2001. Debtor's bankruptcy case was filed April 11, 2005, after expiration of the three year period provided by SC Code Ann. § 15-3-530(7).

5

allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

§ 544(b)(1).

South Carolina's Statute of Elizabeth states in relevant part,

> Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them… which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken… to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

SC Code Ann §27-23-10(A).

The Statue of Elizabeth allows a creditor to avoid a fraudulent transfer of property by a debtor. Section 544 allows the Trustee to "step into the shoes" of those creditors. *See Campbell v. Deans (In re J.R. Deans Co.)*, 249 B.R. 121 (Bankr. D.S.C. 2000). Therefore, in order for the Trustee to maintain a Statute of Elizabeth action there must be a creditor with a valid unsecured claim in the bankruptcy case who could assert a claim to avoid the transfer. The sole creditor on which Plaintiff can rely is Barnwell.

The Statute of Elizabeth authorizes avoidance of fraudulent transfers by both existing and subsequent creditors. *See Mathis v. Burton*, 319 S.C. 261 (S.C. Ct. App. 1995). The standard for avoiding a specific transfer depends on the status of the creditor.

> For existing creditors, conveyances can be set aside in two instances: First, where the challenged transfer was made for a valuable consideration, it will be set aside if the plaintiff establishes that (1) the transfer was made by the grantor with the actual intent of defrauding his creditors; (2) the grantor was indebted at the time of the transfer; and (3) the grantor's intent is imputable to the grantee. Second, where the transfer was not made on a valuable consideration, no actual intent to hinder or delay creditors must be proven. Instead, as a matter of equity, the transfer will be set aside if the plaintiff shows that (1) the grantor was indebted to him at the time of the transfer; (2) the conveyance was voluntary; and (3) the grantor failed to retain sufficient property to pay the indebtedness to the plaintiff in full--not merely at the time of the transfer, but in the final analysis when the creditor seeks to collect his debt.

*Id (Citing Gentry v. Lanneau*, 54 S.C. 514 (S.C. 1899)).

6

The only creditor with standing as an existing creditor at the time of the transfer of the home and the furnishings in February of 2000 is CFB. Its claim is barred by the statute of limitations.[6] Barnwell is the other creditor on which the Plaintiff can rely for standing. It is undisputed that Barnwell is a subsequent creditor and the statute of limitations has not run on its claim. The standard applied when a subsequent creditor challenges a transfer as fraudulent is also set forth in *Gentry v. Lanneau*,

> While it is unquestionably true that the mere fact that a deed is without consideration--a voluntary deed--will not render it fraudulent as to subsequent creditors, especially when they have notice; yet if, in addition to its being voluntary, it was made with a view to future indebtedness, or attended with some circumstances of fraud other than what arises from its being voluntary, then it may be declared null and void for fraud, even at the instance of subsequent creditors. While, therefore, an existing creditor may assail a voluntary deed, even though executed without any evil intent or fraudulent purpose whatever, and even if the motive which prompted the act should be of the most praiseworthy character, yet a subsequent creditor is not permitted to do so without showing some actual moral fraud." *Walker, Evans & Cogswell v. Bollmann Bros.*, 22 S.C. 512, and cases therein cited. In other words, when a subsequent creditor with notice attacks the voluntary deed of his debtor, there is no irrebuttable presumption of fraud arising from the fact that the transfer is without consideration, and the fact of indebtedness at the time; but all the circumstances must be weighed by the Court or jury trying the issue, for the purpose of ascertaining whether fraud, actual and positive, as distinguished from what is called "legal fraud," really existed at the time.

*Gentry v. Lanneau*, 54 S.C. 514, 515-516 (S.C. 1899)(*Citing Jackson v. Plyler*, 38 S.C. 496 (S.C. 1893)). *See also In re J. R. Deans*, 249 B.R. 121, 130-31 (D.S.C. 2000) ("[S]ubsequent creditors may have conveyances set aside when (1) the conveyance was 'voluntary,' that is, without consideration, and (2) it was made with a view to future indebtedness or with an actual fraudulent intent on the part of the grantor to defraud creditors."); *Durham v. Blackard* 438 S.E.2d 259, 262 (S.C. Ct. App. 1993).

---

[6] Throughout the case CFB has been referred to as an existing creditor. While the Court has not made a specific finding to that effect in any order to date, after hearing trial testimony and viewing the trial exhibits the Court believes there is an issue as to whether CFB is an existing or subsequent creditor. Regardless, whether CFB is classified as an existing or subsequent creditor, CFB's claim is barred by the statute of limitations. Thus, the Court need not address the issue.

"The analysis for a subsequent creditor to avoid a fraudulent conveyance is slightly different [from that of existing creditors]. *Deans*, 249 B.R. at 130….The two prongs of the subsequent creditor standard are conjunctive; the Trustee must establish both to prevail." *Campbell v. Collins (In re Collins)*, C/A No. 03-04179-JW, Adv. Pro. No. 04-80284, 2005 Bankr. LEXIS 2924, 16-17(Bankr. D.S.C. April 26, 2005). Plaintiff asserts and Defendant stipulates that the transfer of the home and furnishings was of a voluntary character. Thus, the Court must only determine whether the transfers were made with an actual fraudulent intent on the part of the grantor to defraud creditors or were made with a view to future indebtedness.

The testimony establishes that Debtor had an estate plan in the early 1990's to gift the Debtor's half interest in the couple's home and its contents to Defendant in the event of his death. The plan also provided that any encumbrances on the property were to be satisfied from moneys of the estate before any other disbursements were made. Debtor was asked while he was on the stand why he transferred the Enclave Property to Defendant and he stated,

> I was I think 80 years old, 79, 80 years old. This sale [the Lennox purchase of the furnace division of Ducane] came through and all of our children were taken care of, financially. They all had some stock in the company, nephews and nieces too. I had enough money for myself. I had bought a boat, and the boat was mine, the cash was mine. I told my wife finally, the house was hers.

Debtor was eighty years old at the time of the transfer. Debtor had just sold the business he had built for over 50 years, and received from the sale approximately 3.4 million dollars, after taxes were paid. After the transfer of the Enclave Property and its contents in 2000, as of June 1, 2000, Debtor possessed between $1.5 and $1.8 million in cash and marketable securities, and had an employment contract to receive $3.1 million over the next five years. In fact, he did receive his $800,000 salary in 2000. The transfer of the Enclave Property did not leave Debtor insolvent. It was not until the years following 2000 that Debtor lost the majority of his money in a series of

8

bad business investments.[7] Debtor testified that he lost over $2 million dollars in Ducane Fine Cabinetry over the course of the next few years. He also lost $300,000 on the resale of a yacht that he had purchased, and $60,000 in a lighting company. Mr. Zolin, a former employee of DGG and its predecessors, testified that DGG began to show signs of financial strain sometime in 2001. Debtor also testified that at some point after he sold the yacht he used the equity proceeds from the sale to buy $500,000 in DGG preferred stock.

There is no evidence to suggest that at the time of the transfer of the Enclave Property, or later in 2000, that Debtor had any indication that he would sign a personal guaranty in order to borrow money for DGG three years later in 2003. Debtor had no view of subsequent borrowing at all. Furthermore, there is no indication that Debtor even knew of the opportunity to borrow money from Barnwell until his nephew, Frank Ducate, approached him and told him that DGG was in need of money and asked Debtor if he would attend a meeting with Barnwell to discuss the possibility of Barnwell lending DGG money.[8] Barnwell requested personal guaranties from Debtor, Debtor's son, and their respective spouses including Defendant. Debtor's son, his spouse, and Debtor signed the guarantee, but Defendant refused to do so.

When asked why she refused to sign the personal guarantee Defendant testified that she was not a shareholder of the company, nor had she ever been, and she did not feel as though she should take a risk for a company in which she held no interest and would receive no benefit. There is no evidence that suggests Debtor told her not to sign, in fact, testimony shows that he asked her to sign the guarantee, she declined, and that some animosity developed between Debtor's son and Defendant based on her refusal. Barnwell decided to make the loan to DGG without Defendant's personal guarantee.

---

[7] These bad investments include continuing to support DGG through capital contributions. Both Barnwell and CFB claims in this case arise from loans made to DGG.

[8] While the testimony is unclear as to the exact date Frank Ducate approached Debtor about Barnwell, it is apparent from the record that it was after the infusion of capital from the sale of preferred stock failed to turn the company around. Thus this meeting occurred between late 2001 and 2003. Regardless, it was at least a year and may have been up to two or more years after the transfer of the Enclave Property.

9

At the time of this transaction Barnwell had constructive notice of the Enclave Property transfer, by virtue of the South Carolina recording statute, as the deed was recorded in the Richland County Register of Deed Office on March 20, 2000. "If a creditor is a subsequent one with notice, as such he can have no ground upon which he can say that a gift is a fraud upon him." *Walker, Evans & Cogswell v. Bollmann Bros.*, 22 S.C. 512 (S.C. 1885). In other words, it would be unjust to allow a subsequent creditor to avoid a transfer, even one that is voluntary, as fraudulent if the creditor knew or should have known of the transfer before the debt was incurred.

The Plaintiff relies on the "badges of fraud" recognized in *Coleman v. Daniel* to prove the Debtor possessed fraudulent intent when he made the transfer of the Enclave Property and the contents therein. These recognized "badges of fraud" include,

> the insolvency or indebtedness of the transferor, lack of consideration for the conveyance, relationship between the transferor and the transferee, the pendency or threat of litigation, secrecy or concealment, departure from the usual method of business, the transfer of the debtor's entire estate, the reservation of benefit to the transferor, and the retention by the debtor of possession of the property.

*Coleman v. Daniel*, 261 S.C. 198 (S.C. 1973).

Plaintiff relies upon the exhibits entered into evidence and the expert testimony and opinion of Michael O'Shea. Mr. O'Shea, an expert in forensic accounting, testified that based on his investigation of the Debtor and the documents he was provided by the Plaintiff, it was his opinion that the transfer of the Enclave Property and contents was fraudulent. He based his opinion on *inter alia* the lack of consideration, the timing of the transfers, the relationship between the Debtor and Defendant, the fact that the transfer appeared outside the normal course, the reservation of benefit to the Debtor, and the fact that the transaction appeared to have been carried out in secret. In other words, he formed his opinion based on the fact that there were numerous "badges of fraud" present surrounding the transfer. He offered no opinion as to actual fraud, related no evidence of actual fraud, and based his opinion solely on the circumstances surrounding the transfer. This is an insufficient basis for avoiding a transfer by a subsequent

10

creditor. Under South Carolina law a subsequent creditor, especially one with knowledge, may not rely only on "badges of fraud" (i.e., constructive fraud) to prove fraudulent intent.

> Whereas the familiar indicia or badges of fraud may, in many instances, be relied on by an existing creditor as establishing a case for the granting of relief, it is not sufficient for a subsequent creditor to make out a case of merely constructive fraud, founded on such facts as lack of consideration or insolvency on the part of the transferor. He must establish fraud in fact, or actual fraud, and he must assume the burden of proof in this respect. Thus, to have a transfer set aside pursuant to the fraudulent conveyance law, a creditor whose claim did not arise until after a challenged transfer must show actual moral fraud, rather than simply legal fraud.

*37 Am Jur 2d Fraudulent Conveyances and Transfers § 128* (*citing Mathis v. Burton*, 460 S.E.2d 406, 408 (S.C. Ct. App. 1995)) (*internal citations omitted*).

Furthermore, supposing that constructive fraud were enough to avoid the transfer, the Court believes that the Defendant adequately explained the circumstances surrounding the transfer to rebut any inference of fraud. The case Plaintiff cites for the "badges of fraud," *Coleman,* also states,

> Certain circumstances so frequently attend conveyances to defraud creditors that they are recognized and referred to as "badges of fraud". The badges tend to excite suspicions as to the bona fides of a challenged conveyance. Unexplained, they may warrant an inference of fraud. Whether the inference is warranted depends in large measure on whether a satisfactory explanation is presented. While one circumstance recognized as a badge of fraud may not alone prove fraud, where there is a concurrence of several such badges of fraud an inference of fraud may be warranted.

*Coleman*, 261 S.C. 198 (S.C. 1973).

While there is a "concurrence" of several badges of fraud, the Defendant and her witnesses have supplied ample evidence that there was no intention to defraud creditors. Rather, Debtor continued to contribute to DGG and depleted his resources, not in fraud of creditors, but in a series of bad business deals. Based on the testimony of the defense witnesses, the Court finds that the Defendant's explanation of the events surrounding the transfer is satisfactory, and thus, any inference of fraud from the "badges of fraud" would not be warranted. The Plaintiff has not

11

proven actual "moral" fraud in regards to the transfer and the Court finds for the Defendant on the cause of action for avoidance of the transfer of the Enclave Property and the contents therein.

### *§ 548 Claim*

The Plaintiff's final cause of action is a claim under § 548 to avoid the transfer of multiple deposits made to Defendant's Bank of America account ("Household account") totaling $334,166.09 in the year prior to the Debtor filing bankruptcy. Section 548[9] provides, in relevant part,

> (a) (1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 1 year before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts mature.

11 USCS § 548.

"The burden of proof of establishing the existence of the elements of a voidable transfer under section 548 of the Bankruptcy Code rests on the trustee. This burden of proof never shifts." *5-548 Collier on Bankruptcy-15th Edition Rev. P 548.10* (internal citations omitted). The Trustee must prove the elements of § 548 by a preponderance of the evidence. *See Ivey v. Crown Mem'l Park, LLC (In re Lee Memory Gardens, Inc.)*, 2006 Bankr. LEXIS 664 (Bankr. D.N.C.

---

[9] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 lengthened the Trustee's reachback period to 2 years and added a fourth subsection to (a)(1)(B)(ii), which is not relevant to the present adversary.

2006)(Utilizing the preponderance of evidence standard in regards to claims under 11 U.S.C. § 548).

The Trustee alternatively seeks avoidance under § 548(a)(1)(A) and (B) alleging actual fraud or that the Debtor provided funds to the Defendant voluntarily, receiving less than reasonably equivalent value in exchange for the transfers, which rendered him insolvent.

> Under section 548(a)(1)(A), a trustee may avoid any transfer of an interest of the debtor in property made within one year of the filing of the petition if the debtor made such transfer with actual intent to hinder, delay, or defraud creditors. This provision requires proof of actual intent to defraud. However, no showing of actual fraud is required under section 548(a)(1)(B). Under section 548(a)(1)(B), a trustee may recover without establishing actual fraud. In order to avoid a transfer under section 548(a)(1)(B), a trustee must establish that (1) the debtor had an interest in the property transferred; (2) the interest was transferred within one year of the filing of the bankruptcy petition; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) the debtor received less than a reasonably equivalent value in exchange for such transfer.

*Ivey v. Crown Mem'l Park, LLC (In re Lee Memory Gardens, Inc.)*, 2006 Bankr. LEXIS 664, 4-5 (Bankr. D.N.C. 2006).

Thus, the first element that Plaintiff must prove that is common to both § 548(a)(1)(A) and 548(a)(1)(B) is that the transfers were made by the Debtor. It is stipulated by the parties that $334,166.09 was deposited into the Household Account between April 14, 2004 and April 5, 2005. The issue is the source of the deposits. Mr. O'Shea, the Plaintiff's expert, testified that he could identify approximately $77,000[10] as deposits made by the Defendant from her own funds. Therefore, based on the Plaintiff's own evidence the most Plaintiff could avoid is $256,166.09.

The Plaintiff's § 548 claim against the remaining funds is premised on the argument that because the origin of the funds was not earlier provided by Defendant and cannot readily be determined then the funds deposited must have come from the Debtor. The Plaintiff bases this argument primarily on testimony taken at Debtor's Fed. R. Bankr. P. 2004 examination and

---

[10] Mr. O'Shea's report (*Plaintiff's Exhibit #68)* shows a total of $65,810.07. During his testimony he identified two other sources which were not covered in his report to arrive at his approximation.

13

deposition testimony from both Debtor and Defendant. The testimony, on which the Plaintiff relies, in summary, is that over the years of the Ducates' marriage Defendant paid all the household bills from the Household Account and Debtor deposited money into the account to fund the payments. Since the only income Defendant claimed in 2004 was from social security in the amount $14,156, the Plaintiff argues the remainder came from Debtor. In fact Defendant testified that she had no "income" other than from social security. This does not take into account Defendant's assets.

The evidence at trial shows that Defendant deposited $14,124.00 from her social security checks, $21,400.00 from credit card cash advances, and $194,616.76 from certificates of deposit ("CD")[11] owned by Defendant. *See Defendant's Exhibit # 89.* These deposits total $230,140.76. The evidence further shows that, of the remaining $104,025.33, $2,000 was from Defendant's daughter, $852.40 was deposited from an insurance refund, $1,000 was from the sale of exercise equipment, $794.40 was from the sale of clothing, $436.10 came from a BlueCross BlueShield insurance refund, $488.20 came from a refund of rent, $400.00 was deposited from funds given to Defendant by her sister, and $3,888.89 was deposited into the Household Account from insurance policy proceeds. The Court finds that $240.000.75 of the total amount deposited to the Household Account in the year prior to bankruptcy was not transferred into the account by the Debtor. Thus, the most that could have been transferred into the Household Account by the Debtor is $94,165.34. The Defendant admits that Debtor deposited $93,882.00 into the Household Account the year prior to filing bankruptcy. *See Defendant Exhibit # 89.*

The Plaintiff first attempts to avoid the transfer of these funds under § 548(a)(1)(A) by proving actual fraud. Plaintiff attempts to prove actual fraud by inference from "badges of fraud." Section 548 does permit the Court to infer actual fraud under a constructive fraud theory.

---

[11] There is some indication from the evidence that Defendant purchased the CDs with the proceeds from the sale of the Enclave Property in 2003. Having found that the Enclave Property transfer was not fraudulent, the Court considers the funds in the CDs to be Defendant's personal funds.

14

However, while "badges of fraud," if present, do allow the Court to infer fraudulent intent, that is not the end of the inquiry.

> While each fact does not have to demonstrate actual fraud, the facts taken together must lead to the conclusion that actual fraud existed. *4 Collier on Bankruptcy, para. 548.02[5]* (15th ed. 1989). Courts, however, are aware that there is a difference between actual and constructive fraudulent intent. Regardless of the ability of courts to infer actual fraudulent intent from the presence of "badges of fraud," *see Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987), actual fraudulent intent requires a subjective evaluation of the debtor's motive. Certainly, an objective determination has bearing on whether constructive fraudulent intent exists, but is not conclusive for actual fraudulent intent. See *Id*. at 1509.

*In re Jeffrey Bigelow Design Group*, 956 F.2d 479, 483-484 (4th Cir. 1992).

While there are several badges of fraud present and the Court *may* infer actual fraud, the defense witnesses' testimony, taken as a whole, satisfactorily explains the circumstances surrounding the transfers, and the Court finds that the transfers were not made with actual intent to hinder, delay, or defraud creditors. Defendant and Debtor testified that during their marriage of 25 years it was common for Debtor to transfer funds to the account to fund the payment of household bills. Defendant would then pay the bills from the Household account for expenses incurred by both Debtor and Defendant. Ira Zolin also testified to this effect based on his long history with the Ducate businesses and the practice of advancing funds from the business to various household accounts. Additionally, it appears that the majority, if not all the funds transferred into the Household account by Debtor, were used for his direct or indirect benefit.

The Plaintiff's final claim is under § 548(a)(1)(B). To prevail under § 548(a)(1)(B) the Plaintiff must establish that (1) the transfer was made by the Debtor; (2) the transfer occurred within one year of the filing of the bankruptcy petition; (3) Debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) Debtor was insolvent at the time of the transfer or became insolvent as a result thereof. *§548(a)(1)(B)*. Debtor admits making transfers of $93,882.00 which consists of his social security benefits and income he produced from

15

consulting. Prongs one and two of the test are satisfied. This leaves the question of whether Debtor received reasonably equivalent value for the money he transferred into the account.

> Reasonably equivalent value is not susceptible to simple formulation. As long as the unsecured creditors are not worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

*Sigmon v. Butner (in Re Johnson Bros. Truckers, Inc.)*, 9 Fed. Appx. 156 (4th Cir. 2001).

Defendant testified about numerous expenses listed on *Defendant Exhibit #109*. She testified that she disbursed, for the direct benefit of Debtor, the following:

1. $45,000 - payments to Debtor's Carolina First credit card
2. $8,000 - payments to Debtor's Capital One credit card
3. $2,641.16 - health insurance premiums
4. $8,847.50 - life insurance premiums
5. $1,620.40 - medical expenses
6. $525.00 - income tax return preparation
7. $613.52 - attorney's fees

These amounts equal $67,247.58. Defendant also testified about the other expenses listed on *Defendant Exhibit #109* that she asserts were paid on behalf of the Debtor. These remaining expenses are joint expenses and one-half the expense is considered as benefiting the Debtor. The expenses include:[12]

1. $2,740.00 – Contributions to Church
2. $3,937.86 – Electricity, water, sewer, and gas
3. $3,011.15 – Phone
4. $1,709.00 – Cable
5. $7,755.28 – Van Payments
6. $3,465.00 – Honda Payments
7. $3,531.50 – Home Owner and Auto Insurance
8. $9,483.36 – Property and Auto Taxes
9. $911.58 – Club Dues
10. $12,049.46 – Groceries
11. $1,853.52 – Sam's Club
12. $6,523.40 – Department Stores
13. $1,400 – Loan payment
14. $11,132.87 – Miscellaneous (i.e., Vet bills, pet food, home improvement, etc.)

TOTAL = $69,503.98
         /2

---

[12] The Court did not include in its calculation the categories of New home cost or unidentified checks listed on the exhibit.

16

= $34,751.99

These two categories of expenses equal $101,999.57. The Plaintiff provides no evidence that refutes Defendant's accounting of the disbursed funds. The Debtor received reasonably equivalent value for the transfers he made into the Household account. Thus, there can be no fraudulent transfer under § 548(a)(1)(B). *See Sigmon, supra.*

The Plaintiff bears the burden of showing that a transfer was not for reasonably equivalent value. *Field v. United States (In re Abatement Envtl. Res., Inc.)*, 102 Fed. Appx. 272 (4th Cir. 2004) *See also Gen. Elec. Credit Corp. v. Murphy (In re Duque Rodriguez)*, 895 F.2d 725, 726 n.1 (11th Cir. 1990). If the initial burden is on a plaintiff to show that a transfer was not for reasonably equivalent value it stands to reason that if a defendant comes forward with evidence showing the reasonably equivalent value, a plaintiff must impeach the relevant testimony or come forward with other evidence to show the court that the evidence provided by the defendant is unreliable. The Plaintiff did neither.

For these reasons the Court finds that Plaintiff has failed to prove the third element of § 548(a)(1)(B). The Court need not determine whether Debtor was insolvent at the time of the transfer or became insolvent because of it.

## *Conclusion*

The Court finds in favor of the DEFENDANT on all causes of action.

**AND IT IS SO ORDERED.**
Columbia, South Carolina
April 17, 2007

17